UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


<u>Gordon-Darby Holdings, Inc.</u>

      v.                                          Civil No. 25-cv-508-LM-AJ
                                                    Opinion No. 2026 DNH 011 P
<u>NH Department of Safety,</u>
<u>Commissioner et al</u>


## O R D E R

      This case involves New Hampshire's motor vehicle inspection program. In June 2025, the State passed a law abolishing the program. The State then communicated to its citizenry that motor vehicle inspections would no longer be required as of the law's effective date (January 31, 2026). However, all parties in this case agree that federal law continues to require New Hampshire to maintain an inspection program. The parties also agree that, unless the federal Environmental Protection Agency approves the State's decision to abolish the inspection program before January 31, the State will be in violation of the Clean Air Act as of that date.

      The plaintiff in this suit, Gordon-Darby Holdings, Inc. ("Gordon-Darby"), is the parent company of the vendor that has administered New Hampshire's inspection program since its inception. Gordon-Darby sues the Commissioners of the New Hampshire Department of Safety ("NHDOS") and the New Hampshire Department of Environmental Services ("NHDES") (collectively, "the Commissioners") under the Clean Air Act's private right of action, 42 U.S.C.

§ 7604(a), contending that the State's abolition of the inspection program, absent EPA approval, violates the Clean Air Act.

Gordon-Darby moves for a preliminary injunction (doc. no. 10), seeking a court order to stop the repeal of the inspection program before the repeal takes effect on January 31. For the following reasons, Gordon-Darby's motion is granted.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities is in the movants' favor; and (4) an injunction is in the public interest. US Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC, 121 F.4th 339, 347 (1st Cir. 2024). Of these, likelihood of success on the merits and irreparable injury are the most important factors. González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009). When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. Does 1-6 v. Mills, 16 F.4th 20, 37 (1st Cir. 2021).

## FINDINGS OF FACT

I.    Statutory and Regulatory Background

"President Lyndon B. Johnson signed the Clean Air Act into law in 1963 to 'protect and enhance the quality of the Nation's air resources so as to promote the

public health and welfare and the productive capacity of its population.'" Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 129 (2025) (Jackson, J., dissenting) (quoting 42 U.S.C. § 7401(b)(1)). The Act "divides responsibilities among state and federal governments." Conservation L. Found., Inc. v. Acad. Express, LLC, 129 F.4th 78, 82 (1st Cir. 2025). The United States Environmental Protection Agency ("EPA") "identifies air pollutants that 'may reasonably be anticipated to endanger public health or welfare,' and promulgates air-quality standards limiting concentrations of those pollutants." Id. (quoting 42 U.S.C. § 7408(a)). "States, in turn, bear the 'primary responsibility' for ensuring compliance with EPA limits." Id. (quoting 42 U.S.C. § 7401(a)(3)).

The Clean Air Act requires each state to submit a "State Implementation Plan," or "SIP," to the EPA. 42 U.S.C. § 7410(a)(1). A SIP must "provide[ ] for implementation, maintenance, and enforcement" of air-quality standards set by the EPA. Id. A SIP must also "include enforceable emission limitations and other control measures . . . as may be necessary to meet" the Act's requirements, id. § 7410(a)(2)(A), and "include a program to provide for the enforcement of" such limitations and control measures, id. § 7410(a)(2)(C). In addition, a SIP must contain "necessary assurances that the State . . . will have adequate personnel, funding, and authority under State . . . law to carry out" the implementation plan set forth in the SIP. Id. § 7410(a)(2)(E). After the EPA approves a SIP, the SIP is enforceable under the Clean Air Act as a matter of federal law. Conservation L. Found., 129 F.4th at 83. A state may seek to amend its SIP following the EPA's

approval, but the previously approved SIP remains in effect "during the time a SIP revision proposal is pending." Gen. Motors Corp. v. United States, 496 U.S. 530, 540 (1990).

If the EPA determines that a state contains a "nonattainment area"—i.e., an area that does not meet the EPA's air quality standards—the state's SIP must meet certain additional requirements. 42 U.S.C. § 7410(a)(2)(I); see id. §§ 7501-7515 ("Plan Requirements for Nonattainment Areas"). If a state contains a nonattainment area classified as "moderate," the implementation plan set forth in the SIP "shall . . . include[ ] provisions necessary to provide for a vehicle inspection and maintenance program" ("I/M program") meeting specified requirements. Id. § 7511a(b)(4); see id. § 7511a(a)(2)(B); see also id. § 7511(a)(1) (defining different categories of nonattainment areas). If a state contains a "serious" nonattainment area, its SIP must provide for an "[e]nhanced vehicle inspection and maintenance program" for "each urbanized area (in the nonattainment area) . . . with a 1980 population of 200,000 or more." Id. § 7511a(c)(3). An enhanced I/M program "shall include, at minimum": "[c]omputerized emission analyzers, including on-road testing devices"; "[a]nnual emission testing and necessary adjustment, repair, and maintenance"; and "[o]peration of the program on a centralized basis, unless the State demonstrates to the satisfaction of the [EPA] that a decentralized program will be equally effective." Id. § 7511a(c)(3)(C).

The Clean Air Act also "established by operation of law" an "[o]zone transport region[ ]," or "OTR," for the control of interstate ozone air pollution. Id. § 7511c(a).

The OTR is comprised of eleven northeastern states, including New Hampshire, and the District of Columbia. Id. States within the OTR are required to maintain enhanced I/M programs for each metropolitan area in the state with a population of 100,000 or more. Id. § 7511c(b)(1).

The EPA has promulgated regulations establishing minimum requirements for states' I/M programs. See 40 C.F.R. §§ 51.350-.373. Among other things, the regulations set forth requirements for: inspection criteria; program scope; enforcement against motorists, contractors, and inspection stations for noncompliance; data collection, analysis, and reporting; inspector training and certification; and the availability of resources and authority at the state level to implement and maintain a state's I/M program. id. §§ 51.351-.352, .354, .361, 364-.367, .372. A SIP proposal or revision establishing or altering an I/M program must demonstrate the state's legal authority to implement the I/M program, which must provide for "either broad or specific authority to perform all required elements of the program." Id. § 51.372(a)(5). Any proposal or revision must set forth state-level regulations, interagency agreements, and memoranda of understanding necessary for implementation of the program, along with "[e]vidence of adequate funding and resources to implement all aspects of the program." Id. § 51.372(a)(7), (8). "All I/M programs shall provide that the program will remain effective . . . until the State submits and EPA approves a SIP revision which convincingly demonstrates that the area can maintain the relevant [air quality] standard(s) without benefit of the emission reductions attributable to the I/M program." Id. § 51.350(c).

II.    <u>New Hampshire's I/M Program</u>

The EPA has designated portions of New Hampshire as serious or moderate nonattainment areas with respect to ozone air-quality standards. <u>See</u> 56 Fed. Reg. 56694, 56799 (Nov. 6, 1991); 69 Fed. Reg. 23858, 23920 (Apr. 30, 2004). In light of these nonattainment areas, as well as its membership in the OTR, the Clean Air Act requires New Hampshire's SIP to provide for an I/M program. New Hampshire's current I/M program is largely set forth in a SIP revision submitted to the EPA in 2011 and approved in 2013.[1] <u>See</u> 78 Fed. Reg. 5292, 5300 (Jan. 25, 2013); <u>see also</u> N.H. Code Admin. R. Saf-C 3201 et seq.; doc. no. 10-3 (NHDES's 2011 SIP revision proposal). With two exceptions,[2] the EPA has incorporated into federal law the entirety of New Hampshire's I/M program regulations, meaning those regulations are "inclu[ded] in the State implementation plan [and] fully federally enforceable" under the Clean Air Act. 89 Fed. Reg. 33232, 33233 (Apr. 29, 2024).

Although the Clean Air Act only requires New Hampshire to implement an I/M program with respect to certain regions within the state, New Hampshire's I/M program is statewide. Pursuant to RSA 266:1, NHDOS has statutory authority to require motor vehicle inspections and carry out the I/M program. Motor vehicles must "be inspected once a year, during the month in which the birth date of the

---

[1] New Hampshire has sought and received the EPA's approval for various amendments to its I/M rules since 2013, none of which substantially altered the I/M program.

[2] The EPA declined to incorporate two state-only enforcement mechanisms. 89 Fed. Reg. 33232, 33233 (Apr. 29, 2024).

owner is observed." RSA 266:1, II; <u>accord</u> N.H. Code Admin. R. Saf-C 3210.05(a). The inspection consists of a safety check and an emissions check. N.H. Code Admin. R. Saf-C 3203.01 (parameters of safety check); RSA 266:59-b, I (requiring emissions check); N.H. Code Admin. R. Saf-C 3222.03 (parameters of emissions check). The emissions inspection involves an analysis of the vehicle's "onboard diagnostic system," N.H. Code Admin. R. 3222.03, which is "the computer-based system required by the [EPA] in all 1996 and newer light-duty vehicles and trucks, designed to monitor the performance of certain major engine components, including those components responsible for controlling emissions," N.H. Code Admin. R. 3202.17.

Vehicle inspections must be conducted by approved mechanics at inspection stations certified by NHDOS. N.H. Code Admin. Rs. 3205.05, .09.  A driver's failure to comply with inspection requirements is a violation-level offense. RSA 266:5. Noncompliant drivers are subject to a fine, the suspension or revocation of their vehicle's registration, and arrest. <u>Id.</u>; RSA 594:10, I(a).

New Hampshire's I/M program requires it to contract with a vendor to administer and support the program. <u>See</u> N.H. Code Admin. R. 3202.24. Inspection stations contract with the state's vendor to provide the services and equipment necessary for inspections, including OBD analyzers and inspection stickers. The vendor also provides services to the state itself, including by operating a database that records inspection results and by transmitting inspection data to NHDOS and NHDES.

Gordon-Darby's subsidiary, Gordon-Darby NHOST Services, Inc. ("Gordon-Darby NHOST"), has been the state's vendor since the I/M program's inception. Gordon-Darby NHOST was awarded its first I/M contract with the state in 2004 following a competitive bidding process. After multiple extensions, this contract ran through June 30, 2012. Following another competitive bidding process that began in 2011, Gordon-Darby NHOST was awarded its second I/M contract to serve as New Hampshire's vendor. This second contract was approved in May 2012 and, after multiple extensions, ran through December 31, 2019. Gordon-Darby NHOST's current contract with New Hampshire was also awarded after a competitive bidding process, and it took effect January 1, 2020. It was originally scheduled to expire at the end of 2024. However, in November 2024, New Hampshire extended the contract to December 31, 2026. The contract may be terminated by New Hampshire "at its sole discretion . . . for convenience" on thirty days' written notice. Doc. no. 22-3 at 55.

Gordon-Darby NHOST's only sources of revenue are its contracts with individual inspection stations, which provide for payment of fees to Gordon-Darby NHOST on a per-test basis.[3] It receives no revenue from New Hampshire.

III.    <u>Repeal of New Hampshire's I/M Program</u>

On June 27, 2025, Governor Kelly Ayotte signed House Bill 2 ("HB2") into law. Among other things, HB2 repealed or amended numerous statutory provisions

---

[3] Gordon-Darby, as Gordon-Darby NHOST's parent company, has several other clients and sources of revenue.

8

that authorize and govern New Hampshire's I/M program. See 2025 N.H. Laws §§ 141:244-:253. In effect, HB2 eliminates the requirement under state law that passenger vehicles undergo annual safety and emissions inspections. HB2 also directs NHDES to propose to the EPA an amendment to New Hampshire's SIP "consistent with" HB2 no later than 180 days from HB2's passage. Id. §§ 141:254, :256. The bulk of the I/M program's repeal takes effect on January 31, 2026,[4] regardless of whether the EPA has approved a SIP amendment consistent with HB2 by that time.[5] Id. § 141:256.

Although inspections are still required under state law until January 31, New Hampshire has experienced a substantial decrease in the total number of monthly motor vehicle inspections in the wake of HB2's passage in June 2025. In July 2025, the total number of inspections that occurred was 10% lower than the number of inspections that occurred in July 2024. The total number of inspections

---

[4] Repeal of RSA 266:59-b, which requires emissions testing, does not take effect until "September 30, 2026, or the date when [NHDES] certifies . . . that the [EPA] has approved amendments to the state implementation plan as they relate to emissions testing under the state's vehicle inspection program, whichever is earlier." 2025 N.H. Laws § 141:255; see id. § 141:253, XIV. However, RSA 266:59-b only requires emissions tests for vehicles "subject to inspection under" RSA chapter 266. RSA 266:59-b. HB2 repeals NHDOS's statutory authority to require inspections, and repeal of that statutory authority is effective January 31, 2026. 2025 N.H. Laws § 141:253, IV; id. § 141:256, III. Thus, because NHDOS will lack statutory authority to require inspections after January 31, 2026, emissions testing will no longer be required after that date despite the later date upon which the repeal of RSA 266:59-b becomes effective.

[5] On December 24, 2025, NHDES submitted a proposed SIP amendment to the EPA that would abolish the SIP's requirement that New Hampshire maintain an I/M program, as well as a petition to remove New Hampshire from the OTR. The EPA has not yet acted on NHDES's submissions.

for August and September decreased by 17% and 16% from the previous year's respective monthly totals. October saw a 24% decrease in inspections, and November's decrease was 33% from the previous year.

The state has taken steps to wind down the I/M program. On September 16, 2025, NHDOS sent Gordon-Darby NHOST a letter. The letter stated that, although the parties' contract did not expire until the end of 2026, motor vehicle inspections would no longer be required as of January 31, 2026. Thus, "given the fact that the motor vehicle inspections program will soon be abolished," the letter stated that New Hampshire was exercising its right to terminate Gordon-Darby NHOST's contract for convenience effective January 31, 2026. Doc. no. 1 at 33.

On or about September 18, 2025, NHDOS published an FAQ on its website informing the public that inspections will no longer be required after January 31, 2026 and that no inspection stickers will issue after that date. Then, on November 12, 2025, the Director of the New Hampshire Department of Motor Vehicles, an agency within NHDOS, gave a radio interview where he informed the public that motor vehicle inspections would no longer be required as of January 31. That same month, NHDOS sent letters to authorized inspection stations stating that those stations "will no longer be authorized or required to perform vehicle safety or emissions inspections after January 31, 2026." Doc. no. 22-3 at 151. The letters directed inspection stations to return state-issued inspection stickers to NHDOS no later than February 28, 2026.

10

Meanwhile, on October 7, 2025, Gordon-Darby sent the Commissioners a letter notifying them of intent to sue under the Clean Air Act. Their claim in that letter mirrored in all relevant respects their claim in this lawsuit: that failure to enforce the I/M program contained in New Hampshire's SIP violates the Clean Air Act.

## DISCUSSION

Gordon-Darby filed this lawsuit on December 8, 2025, approximately sixty days after giving the Commissioners notice of its intent to sue. Gordon-Darby brings a single claim against the Commissioners pursuant to the Clean Air Act's citizen-suit provision. 42 U.S.C. § 7604(a). The Clean Air Act permits any "person" to bring a civil action against any other "person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter." Id. Gordon-Darby claims that, by implementing HB2's repeal of New Hampshire's I/M program absent EPA approval of a new SIP incorporating that repeal, the Commissioners are in violation of New Hampshire's current SIP.

As noted, to obtain a preliminary injunction, Gordon-Darby must demonstrate a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, and that an injunction is consistent with the equities and the public interest. US Ghost Adventures, 121 F.4th at 347; Does 1-6, 16 F.4th at 37. The court will consider each in turn.

## I.    Likelihood of Success on the Merits

As an initial matter, the Commissioners contend that Gordon-Darby is not likely to succeed on its claim because Gordon-Darby cannot show a substantial likelihood of standing. See Pietrangelo v. Sununu, Civ. No. 21-cv-124-PB, 2021 WL 1254560, at *5 (D.N.H. Apr. 5, 2021) ("'[T]he "merits" on which [the] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction,' including standing." (quoting Waskul v. Washtenaw Cnty. Cmty. Mental Health, 900 F.3d 250, 256 n.4 (6th Cir. 2018))). The court first considers Gordon-Darby's standing before addressing the substantive merits of its Clean Air Act claim.

### A.    Gordon-Darby Has Shown a Substantial Likelihood of Standing

"Article III of the Constitution confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Diamond Alt. Energy, 606 U.S. at 110 (quoting U.S. Const. art. III, § 2). This case-or-controversy requirement "is crucial in maintaining the 'tripartite allocation of power' set forth in the Constitution." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982)). As Chief Justice Marshall recognized long ago, "[i]f the judicial power extended to every question under the constitution it would involve almost every subject proper for legislative discussion and decision . . . . The division of power among the branches of government could exist no longer, and the other departments would be

12

swallowed up by the judiciary." Id. (brackets and emphasis omitted) (quoting 4 Papers of John Marshall 95 (C. Cullen ed. 1984)).

The doctrine of standing emanates from the case-or-controversy requirement. United States v. Texas, 599 U.S. 670, 675 (2023). Standing requires that plaintiffs have "a personal stake in the dispute," ensuring they are not "mere bystanders." Diamond Alt. Energy, 606 U.S. at 110 (quoting FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024)). In so requiring, "[t]he doctrine limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). "By limiting who can sue, the standing requirement implements the Framers' concept of the proper—and properly limited—role of the courts in a democratic society." Diamond Alt. Energy, 606 U.S. at 111 (quoting All. for Hippocratic Med., 602 U.S. at 380).

To demonstrate standing, a plaintiff must show (1) injury in fact, (2) causation, and (3) redressability. Id. At the preliminary injunction stage, a plaintiff must demonstrate a "substantial likelihood" of standing. Pietrangelo, 2021 WL 1254560, at *5 (quoting Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 913 (D.C. Cir. 2015)); see also Bennett v. Spear, 520 U.S. 154, 167-68 (1997) ("[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992))).

### 1. Injury in Fact

An injury in fact must be both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical. Defs. of Wildlife, 504 U.S. at 560. "An injury is concrete when it is 'real, and not abstract,'" and it is "particularized if it 'affects the plaintiff in a personal and individual way.'" Conservation L. Found, 129 F.4th at 86-87 (brackets omitted) (first quoting Spokeo, 578 U.S. at 340, and then quoting Defs. of Wildlife, 504 U.S. at 560 n.1). "Monetary costs are of course an injury." United States v. Texas, 599 U.S. at 676. An injury is imminent when it is "likely to occur soon." All. for Hippocratic Med., 602 U.S. at 381.

In this case, Gordon-Darby claims that the Commissioners' implementation of the repeal of the I/M program will deprive Gordon-Darby NHOST of approximately $4.1 million in revenues through the end of 2026 (i.e., through the end of the term of its contract with New Hampshire to serve as its I/M program vendor). In addition, Gordon-Darby has produced evidence that monthly motor vehicle inspection rates have already dropped by as much as 33% from the previous year's rates. Because Gordon-Darby NHOST is paid by inspection stations on a per-inspection basis, it has already lost approximately $350,000, in addition to the $4.1 million decrease in revenues it expects to experience through the remainder of its contract term once the I/M program's repeal takes effect. As administering New Hampshire's I/M program is Gordon-Darby NHOST's sole source of business, repeal of the I/M program will likely drive Gordon-Darby NHOST out of business. These actual and imminent monetary harms are "obvious" examples of injury in fact.

TransUnion LLC v. Ramirez, 594 U.S. 413, 425 (2021). Moreover, although these economic harms are felt directly by Gordon-Darby NHOST rather than Gordon-Darby itself, the Supreme Court has held that financial injury to a subsidiary corporation confers Article III standing on its parent corporation. See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd., 493 U.S. 331, 336 (1990) (explaining that allegedly unlawful taxes on subsidiaries injure parent companies by "reducing the return on their investments in [their subsidiaries] and by lowering the value of their stockholdings"); see also Gianfresco v. Town of Wrentham, 712 F.3d 634, 638 (1st Cir. 2013) (restaurant owner had standing to challenge allegedly unlawful regulations directed at restaurant; "the defendants' actions, although taken against his business rather than against [plaintiff] himself, caused him 'actual financial injury' by driving [his restaurant] out of business" (quoting Franchise Tax Bd., 493 U.S. at 336)).

The Commissioners do not agree that Gordon-Darby adequately demonstrates an injury in fact sufficient to obtain a preliminary injunction. Specifically, the Commissioners contend that Gordon-Darby's complaint fails to plead facts that, if accepted, make Gordon-Darby's standing plausible. E.g., Webb v. Injured Workers Pharm., LLC, 72 F.4th 365, 371 (1st Cir. 2023) (complaint must plausibly allege facts showing standing under standard applicable to a 12(b)(6) motion). However, in evaluating whether Gordon-Darby has demonstrated a substantial likelihood of standing in order to obtain a preliminary injunction, the

court is not limited to the allegations in Gordon-Darby's complaint.[6] Doe v. Trump, 157 F.4th 36, 47 (1st Cir. 2025). Rather, the court may also consider materials of evidentiary quality submitted in support of the preliminary injunction motion. Id. Regardless of whether the complaint plausibly alleges standing, the evidence of monetary harm to Gordon-Darby discussed above was provided in support of Gordon-Darby's preliminary injunction motion, is uncontested by the Commissioners, and establishes a substantial likelihood of injury in fact.

The Commissioners also argue that Gordon-Darby fails to sufficiently demonstrate an injury in fact because its contract with the state was terminable by the state for convenience. As the court understands the Commissioners' argument, because the state could have terminated its contract with Gordon-Darby for convenience at any time it desired, Gordon-Darby had no right that "actually exist[ed]" to receive payments from inspection stations. Doc. no. 20-1 at 6 (quotation omitted). The court is not persuaded. It is undisputed that, because of its contract with the state, Gordon-Darby NHOST had the exclusive right to contract with inspection stations to provide supplies and services to facilitate inspections in exchange for payment from said stations. It is also undisputed that Gordon-Darby NHOST exercised that right, contracted with inspection stations, and generated

---

[6] The Commissioners have filed a motion to dismiss the complaint on standing grounds and for failure to state a claim upon which relief may be granted. Doc. no. 20. That motion remains pending. In their objection to the preliminary injunction motion, the Commissioners incorporated by reference the standing arguments raised in their motion to dismiss but did not develop any additional arguments against standing.

substantial revenues from those contracts. The loss of revenue from inspection stations constitutes an injury in fact for standing purposes. For these reasons, Gordon-Darby shows a substantial likelihood of injury in fact.

2. Causation and Redressability

Causation and redressability "are usually 'flip sides of the same coin.'" Diamond Alt. Energy, 606 U.S. at 111 (quoting All. for Hippocratic Med., 602 U.S. at 380). "Causation requires the plaintiff to show 'that the injury was likely caused by the defendant,' and redressability requires the plaintiff to demonstrate 'that the injury would likely be redressed by judicial relief.'" Id. (quoting TransUnion, 594 U.S. at 423). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." All. for Hippocratic Med., 602 U.S. at 381. Where a plaintiff has "suffered classic monetary injury caused by a government regulatory action, it would be surprising and unusual if invalidating the regulations did not redress the [plaintiff's] injuries." Diamond Alt. Energy, 606 U.S. at 117. "[C]ourts should exercise caution before denying standing because of a claimed lack of redressability rooted in questionable economic speculation." Id. at 123.

As noted, the monetary injury to Gordon-Darby results from the termination of its subsidiary's contract to serve as New Hampshire's vendor for the state's I/M program. NHDOS sent Gordon-Darby NHOST a letter in September 2025 notifying Gordon-Darby NHOST that the state was terminating its contract for convenience because of "the fact that the motor vehicle inspections program will soon be abolished." Doc. no. 1 at 33. Apart from the abolition of the I/M program and the

contract's termination-for-convenience provision, NHDOS cited no other grounds for terminating the contract. Thus, Gordon-Darby shows a substantial likelihood of causation.

As for redressability, the Commissioners observe that a preliminary injunction in this case would not, by its own terms, order the Commissioners to reinstate Gordon-Darby NHOST's contract. Instead, an injunction would enjoin the Commissioners from implementing those portions of HB2 that repeal New Hampshire's I/M program or otherwise order them to administer, enforce, and comply with the I/M program contained in New Hampshire's SIP. But neither the SIP, the Clean Air Act, nor New Hampshire's I/M program as contained in state law requires the Commissioners to retain Gordon-Darby NHOST as the vendor in charge of administering and supporting its I/M program. Instead, the Commissioners say, they could simply elect to hire a new vendor even if a preliminary injunction issues.

To satisfy the redressability prong of Article III standing, a plaintiff need not establish that the relief sought is "certain" to redress their injury. Diamond Alt. Energy, 606 U.S. at 124; accord In re Fin. Oversight & Mgmt. Bd. for P.R., 110 F.4th 295, 319 (1st Cir. 2024) ("[R]edress need not be certain . . . ."). "Rather, to show redressability, the plaintiff must simply 'show a predictable chain of events' that would likely result from judicial relief and redress the plaintiff's injury." Diamond Alt. Energy, 606 U.S. at 121 (quoting All. for Hippocratic Med., 602 U.S. at 385); see also Larson v. Valente, 456 U.S. 228, 243 n.15 (1982) (characterizing the

argument that a plaintiff must show certainty of redress as "a draconic interpretation of the redressability requirement that is justified by neither precedent nor principle").

In this case, a preliminary injunction will likely redress Gordon-Darby's injuries. New Hampshire has had one vendor administering its I/M program since its inception over twenty years ago: Gordon-Darby NHOST. To execute a new contract with a new vendor, the state would likely need to employ a competitive bidding process, which would entail preparation of a request for proposals, allowing sufficient time for submissions, and evaluation of bidders' proposals. See RSA 21-I:11, I(a)(2).[7] Gordon-Darby NHOST's 2018 contract with the state, for example, was awarded after a bidding process that took place over the course of a month between September and October 2018. See doc. no. 22-3 at 22. And Gordon-Darby NHOST's first contract with the state was awarded in 2004 after a bidding process that began in 2002. Doc. no. 10-2 at 4. Then, once a bidder is selected, the contract would still be subject to approval by the Governor and Executive Council. RSA 4:15. Moreover, any new vendor would likely need to purchase or develop I/M materials

---

[7] The Commissioners assert that this statute permits the state to dispense with competitive bidding "[w]hen the best interests of the state would be served thereby and the purchase involves a total expenditure of not more than $10,000," or "[w]hen, in the opinion of the governor, an emergency exists of a nature which requires the immediate procurement of supplies." RSA 21-I:11, I(a)(2)(A), (D). But again, the fact that the state may dispense with competitive bidding in certain circumstances does not mean the state is likely to do so in this case. Nor is there any evidence that the Governor is likely to declare that a court order requiring the continuation of New Hampshire's I/M program constitutes an "emergency" of such a "nature" that "the immediate procurement of supplies" is necessary. RSA 21-I:11, I(a)(2)(D).

specific to New Hampshire's program, which cannot happen instantaneously. Gordon-Darby NHOST already has those materials readily available. Finally, given New Hampshire's repeal of the I/M program under state law and its pending SIP revision proposal before the EPA that would abolish the I/M program under federal law, it is speculative that the state could attract bidders willing to invest the resources necessary to develop New Hampshire-specific inspection supplies.

As the Supreme Court admonished just last term, "courts should exercise caution before denying standing because of a claimed lack of redressability rooted in questionable economic speculation." Diamond Alt. Energy, 606 U.S. at 123. It is entirely speculative that the state would (or could) hire a new I/M vendor for the remainder of 2026 with so little time to do so. Rather, if a preliminary injunction issues, it is likely that the state elects to reinstate Gordon-Darby NHOST's contract.[8] Gordon-Darby therefore shows a substantial likelihood of redressability.

The court turns to Gordon-Darby's showing on the substantive merits of its Clean Air Act claim.

B.    Gordon-Darby Is Likely To Succeed on the Merits of Its Clean Air Act Claim

The Clean Air Act's citizen-suit provision authorizes a civil action against "any person . . . who is alleged to have [repeatedly] violated . . . or to be in violation

---

[8] Although the Commissioners hint in their preliminary injunction objection that, "[h]aving been haled into Court" by Gordon-Darby, the state may not wish to reinstate its subsidiary's contract, the Commissioners make no express assertions, in declarations or otherwise, as to whether they would or would not seek to reinstate Gordon-Darby NHOST's contract if a preliminary injunction issues. Doc. no. 22 at 8-9.

of . . . an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). Thus, to prevail in such an action, the plaintiff must demonstrate that (1) the defendant is a "person" (2) who has repeatedly violated or is in violation of (3) an emission standard or limitation under the Clean Air Act. Id. In addition, "[n]o action may be commenced" under § 7604(a)(1) "prior to 60 days after the plaintiff has given notice of the violation." Id. § 7604(b)(1)(A).

There is no dispute that the Commissioners are "persons" within the meaning of this provision. See id. § 7604(a)(1) (defining "person" to include "any . . . governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution"). They are named in their official capacities, and Gordon-Darby seeks only prospective and declaratory relief. See Cotto v. Campbell, 126 F.4th 761, 767-68 (1st Cir. 2025) (discussing Ex parte Young doctrine); see also Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 530 n.24 (1st Cir. 2009) ("The Ex parte Young opinion was premised on the theory that since the state cannot authorize [action that violates federal law], the officer is 'stripped of his official or representative character and subjected in his person to the consequences of his individual conduct.'" (ellipsis omitted) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102 (1984))).

There is also no dispute that New Hampshire's I/M program contained in its SIP is an emission standard or limitation under the Clean Air Act. See 42 U.S.C. § 7604(f) (defining "emission standard or limitation under this chapter" to include any "standard, limitation, or schedule established under . . . any applicable State

implementation plan approved by the [EPA] Administrator"). There is not even a dispute that, as of January 31, the Commissioners will be "in violation of" the Clean Air Act (unless the EPA approves a SIP amendment abolishing New Hampshire's I/M program before that date). Id. § 7604(a)(1). The parties only dispute (1) whether the Commissioners are currently "in violation of" the SIP and (2) whether Gordon-Darby provided adequate notice before commencing suit.

      1.    <u>Gordon-Darby Is Likely To Succeed in Showing the Commissioners Are "In Violation Of" the SIP</u>

The parties strenuously dispute whether the Commissioners are currently violating the I/M program requirements contained in New Hampshire's SIP. The Commissioners contend that they are not yet violating SIP requirements because the repeal of the I/M program does not take effect until January 31. Gordon-Darby contends that the Commissioners are currently violating the SIP because they have taken steps to wind down the I/M program, such as by terminating Gordon-Darby NHOST's contract effective January 31, and by informing the public and authorized inspection stations that motor vehicle inspections will no longer be required after January 31.

Neither party frames the issue quite right. The plain text of § 7604 permits the institution of a citizen suit against any person who is "alleged . . . to be in violation of" the Clean Air Act. An allegation that a person is "in violation of" the Clean Air Act is not equivalent to an allegation that the person is <u>presently violating</u> the Act's requirements.

The phrase "in violation of" pairs a noun ("violation") with a prepositional phrase, and therefore refers to "a state" or circumstance "rather than an act—the opposite of a state of compliance." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 69 (1987) [hereinafter Gwaltney I] (Scalia, J., concurring). In other words, to characterize a person as "in violation of" the Clean Air Act is to highlight their status as someone who violates the Act, rather than to highlight their present actions. Even if the person is not presently—as in right now— "violating" the Act, their status may be that of someone "in violation of" the Act. "A good or lucky day is not a state of compliance." Id.

Gwaltney I involved the citizen-suit provision of the Clean Water Act, which, much like its analogue under the Clean Air Act, authorizes suits against any person "alleged to be in violation of" a "standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1); see Gwaltney I, 484 U.S. at 53. The Court concluded that this language did not permit suits based on "wholly past violations," and that the harm "to be addressed by the citizen suit lies in the present or the future." Gwaltney I, 484 U.S. at 57, 59. Especially pertinent to this case, the Court also concluded that § 1365(a)(1) permits the initiation of a suit "when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation"; the plaintiffs need not "prove their allegations of ongoing noncompliance before jurisdiction attaches." Id. at 64. Of course, if "the case proceeds to trial on the merits, . . . the plaintiff must prove the allegations in order to prevail." Id. at 66; see also U.S. Pub. Int. Rsch.

Grp. v. Atl. Salmon of Me., LLC, 339 F.3d 23, 33 (1st Cir. 2003) (confirming that, to obtain relief, the plaintiff must actually "establish[ ] a present violation").

Under Gwaltney I, a plaintiff adequately alleges that the defendant is "in violation of" the Clean Air Act when they "make a good-faith allegation of continuous or intermittent violation." 484 U.S. at 64. After announcing its ruling, the Gwaltney I Court remanded the case to the Fourth Circuit to determine in the first instance whether the plaintiffs had made the requisite allegation. Id. at 67. The Fourth Circuit held that the plaintiffs had done so, and remanded to the district court "for further findings as to whether, on the merits, plaintiffs proved at trial an ongoing violation." Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171 (4th Cir. 1988) [hereinafter Gwaltney II] (per curiam). The Circuit stated that plaintiffs could prove an ongoing violation "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." Id. at 171-72. This formulation has gained widespread acceptance in the caselaw. See Nat. Res. Def. Council, Inc. v. Texaco Refin. & Mktg., Inc., 2 F.3d 493, 501 (3d Cir. 1993) (collecting cases). Thus, a plaintiff may establish that a defendant is "in violation of" the Clean Air Act by showing "a continuing likelihood of recurring violations." Id. at 502.

This interpretation of Gwaltney I and its progeny is consistent with caselaw from district courts within the First Circuit. The District of Puerto Rico adopted

Gwaltney II's framework in holding that a plaintiff plausibly alleges that a defendant is "in violation of" the Clean Water Act by plausibly alleging (1) "that the violations to the Act are continuing, either on or after the date the complaint was filed," or (2) "that said violations are likely to occur in the future." P.R. Campers' Ass'n v. P.R. Aqueduct & Sewer Auth., 219 F. Supp. 2d 201, 216 (D.P.R. 2002). The District of Maine has interpreted the caselaw in this area similarly. See Eastman v. Brunswick Coal & Lumber Co., No. CIV. 95-255-P-C, 1996 WL 911200, at *4 (D. Me. Apr. 19, 1996) ("A state of continuous or intermittent violation exists when there is a 'reasonable likelihood that a past polluter will continue to pollute in the future.'" (quoting Gwaltney I, 484 U.S. at 57)), R&R approved, 1996 WL 905620, at *1 (D. Me. June 6, 1996).

In a pre-Gwaltney I opinion—though one which is consistent with the rule of Gwaltney I—the First Circuit held that a Clean Water Act citizen suit "may go forward if the citizen-plaintiff fairly alleges a continuing likelihood that the defendant, if not enjoined, will again proceed to violate the Act." Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp., 807 F.2d 1089, 1094 (1st Cir. 1986). Indeed, the First Circuit expressly rejected the proposition that dismissal would be appropriate "simply because no violations occurred on the dates the complaints were filed." Id. In reaching this interpretation, the Court highlighted that the phrase "in violation of" should be "liberally construed to comport with the injunctive purpose of the Act"—alleged conduct "justifying an injunction" is sufficient, but allegations as to

"matters over and . . . done with," which would not give rise to the need for an injunction, are insufficient. Id. at 1093.

Given the foregoing review of the law in this area, the court concludes that, at the preliminary injunction stage, Gordon-Darby must demonstrate that there is a substantial likelihood Gordon-Darby will be able to prove at trial that the Commissioners violated the Clean Air Act "on or after the date the complaint is filed" or that there is a "continuing likelihood" the Commissioners will violate the Clean Air Act. Gwaltney II, 844 F.2d at 171-72; see Insight Tech. Inc. v. SureFire, LLC, 447 F. Supp. 2d 120, 123 (D.N.H. 2006) (explaining that likelihood of success on the merits for preliminary-injunction purposes involves inquiry into likelihood that plaintiff will prevail at eventual trial on the merits); Gwaltney I, 484 U.S. at 66. As the Commissioners do not contest that, unless the EPA approves a SIP amendment before January 31, they will begin violating the SIP on that date when the repeal of the I/M program takes effect, Gordon-Darby has made the required showing for purposes of their preliminary injunction motion.

Whether the Commissioners were presently violating the Act at the time this action commenced, or whether they violated the Act prior to its commencement, is not dispositive. Rather, this court's statutory jurisdiction attached at the time Gordon-Darby filed its action because Gordon-Darby's complaint plausibly and in good faith alleged that Clean Air Act "violations are likely to occur in the future." P.R. Campers' Ass'n, 219 F. Supp. 2d at 216. Indeed, the allegations of the

complaint plausibly demonstrate that Clean Air Act violations are not merely likely, but imminent.

To be sure, many of the cases discussed above involved circumstances in which the defendant had already taken some action in violation of the Clean Air Act or Clean Water Act and the question to be answered was whether such violations were likely to continue or recur after the time of the complaint's filing. E.g., Eastman, 1996 WL 911200, at *4-5. But in those cases, the recurring nature of those prior violations simply constituted evidence "that a past polluter will continue to pollute in the future." Id. at *4 (quoting Gwaltney I, 484 U.S. at 57); see also Pawtuxet, 807 F.2d at 1094 ("If a defendant's past history is such that it is reasonable to believe that misconduct will continue, not only is it reasonable to allege a continuing violation, but this is precisely the showing that would induce a court to issue an injunction."). Indeed, Gwaltney I makes clear that a plaintiff cannot prove that a defendant is "in violation" of the Clean Water Act based on "wholly past violations"; instead, the citizen-plaintiff's suit must be "primarily forward-looking" and seek to address a "harm [that] lies in the present or the future." Gwaltney I, 484 U.S. at 57, 59.

That other suits involved both past and future violations, whereas this suit involves only prospective (but virtually certain) violations, may stem from the unique facts of this case. Here, the State of New Hampshire has enacted legislation that is directly contrary to the requirements of New Hampshire's SIP as incorporated by reference into the Clean Air Act. Unless the EPA approves a SIP

amendment before January 31, New Hampshire will indisputably be violating the Clean Air Act as of that date. The court is unaware of another case in which a regulated entity announces an intent to commence violating the Clean Air Act on a particular date, and a plaintiff is able to show a substantial likelihood that the entity's announced violation will occur as stated. Given the "injunctive purpose" of the Clean Air Act, the court's conviction is firm that such an entity is "in violation of" the Clean Air Act. Pawtuxet, 807 F.2d at 1093.

It is also important to remember that the inquiry into a movant's likelihood of success for purposes of a preliminary injunction is an inquiry into "the movant's likelihood of success at trial." Cohen v. Brown Univ., 991 F.2d 888, 903 (1st Cir. 1993) (emphasis added); see also Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal, 546 U.S. 418, 429 (2006). In other words, whether Gordon-Darby can conclusively establish that the Commissioners are presently "in violation of" the Clean Air Act as of today's date is not what counts for preliminary injunction purposes; what matters is whether they are likely to prove the Commissioners are in violation of the Act as of the time of trial. Any trial in this case would occur long after the repeal of the I/M program takes effect on January 31, and it is undisputed that the Commissioners will violate the Clean Air Act as of that date. This conclusion is consistent with Gwaltney I and its progeny, which only require an allegation of a continuous or intermittent violation at the suit's inception; the

plaintiff then must "establish[ ] a present violation" at the trial on the merits. Atl. Salmon of Me., 339 F.3d at 33; see Gwaltney I, 484 U.S. at 65-66.

Finally, even if the trial in this matter was to occur prior to January 31, Gordon-Darby can point to violations of the SIP that are currently ongoing. As noted, the EPA has promulgated regulations establishing minimum requirements for states' I/M programs as contained in their SIPs. One such requirement is that every SIP "include a plan for informing the public . . . throughout the life of the I/M program" on "the requirements of Federal and State law . . . and the requirements of the I/M program." 40 C.F.R. § 51.368(a). The Commissioners are presently informing the citizenry of New Hampshire that motor vehicle inspections are no longer required after January 31. While that may be true as a matter of state law, it is not true as a matter of federal law and misstates the requirements of the I/M program contained in New Hampshire's SIP, which continues to be in effect under the Clean Air Act unless and until the EPA grants a SIP amendment discontinuing the program. Id. § 51.350(c). In addition, a SIP must provide that "[t]he State shall commit to fully implement and enforce the [I/M] program" contained in the state's current SIP "until . . . a demonstration can be made and approved by the EPA" that the area subject to an I/M program requirement "can maintain the relevant [air-quality] standard(s) without benefit of the emission reductions attributable to the I/M program." Id. The Commissioners are presently not committed to fully implementing the I/M program because they have terminated the contract of the

vendor that administers the program and have directed inspection stations to return state-issued inspection supplies by the end of February 2026.[9]

For all of these reasons, Gordon-Darby is likely to succeed in demonstrating that the Commissioners are "in violation of" the Clean Air Act.

### 2. Gordon-Darby Is Likely to Succeed in Showing It Complied With Section 7604's Notice Requirements

The Commissioners also contend that Gordon-Darby is not likely to succeed on the merits of its Clean Air Act claim because it did not provide sufficient notice before commencing this action. Section 7604(b)(1)(A) provides that, before commencing a citizen suit under § 7604(a)(1), the plaintiff must give sixty days' notice "of the violation" to the EPA, the state "in which the violation occurs," and "any alleged violator." 42 U.S.C. § 7604(b)(1). "Notice from potential private plaintiffs gives the EPA and the state an opportunity to investigate the alleged violation," permitting the EPA or state to bring an enforcement action of its own if it so chooses, and giving the alleged violator a chance to cure the violation and thereby avoid suit altogether. Garcia v. Cecos Int'l, Inc., 761 F.2d 76, 81-82 (1st Cir. 1985); see also 42 U.S.C. § 7604(b)(1)(B) (barring the commencement of a citizen suit if the EPA or state "has commenced and is diligently prosecuting a civil action in a court

---

[9] The court understands that the Commissioners' actions are simply good-faith attempts to implement duly enacted New Hampshire legislation consistent with their solemn and important duties. The Commissioners are not responsible for the fact the repeal of New Hampshire statutory authority to require motor vehicle inspections takes effect regardless of whether the EPA has approved a SIP revision discontinuing the program.

of the United States or a State to require compliance with the standard, limitation, or order").

In this case, Gordon-Darby sent a letter to the Commissioners and the EPA on October 7, 2025, stating Gordon-Darby's intent to commence a civil action against the Commissioners under § 7604(a)(1). Doc. no. 1 at 17. The letter clearly states Gordon-Darby's allegation that the Commissioners' failure, as of January 31, 2026, to implement the I/M program required by New Hampshire's SIP violates the Clean Air Act. In opposing the adequacy of Gordon-Darby's notice, the Commissioners do not contend that Gordon-Darby failed to provide sufficient information regarding their alleged violation or that the notice is somehow substantively deficient. See 40 C.F.R. § 54.3(b) (setting forth required contents of notice). Rather, as with their objection to Gordon-Darby's merits showing, the Commissioners contend that § 7604(b)(1)(A) requires the plaintiff to wait to give notice until they have actually begun violating the Clean Air Act.

The court disagrees. The plain language of § 7604(b)(1)(A) requires the plaintiff to give notice of "the violation." It does not, by its own terms, require that "the violation" have already occurred. Such a construction would be inconsistent with Gwaltney I and its progeny, which, as discussed above, require a focus on present or future violations. See, e.g., Gwaltney I, 484 U.S. at 59. Indeed, given "that the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render

unnecessary a citizen suit," it would make little sense to require the citizen to wait to give notice until the violation they wish to stop has already occurred. Id. at 60.

The Commissioners nevertheless assert that, because one purpose of the notice requirement is to give the EPA an opportunity to bring its own enforcement action, pre-violation notice is insufficient because the EPA may not commence enforcement until the violation has already occurred. Again, the Commissioners misconstrue the statutes. The EPA may commence a civil action against "any person . . . in violation of any requirement or prohibition of an applicable implementation plan." 42 U.S.C. § 7413(a)(1). As in Gwaltney I, the requirement that the person against whom the action is brought be "in violation of" a SIP is not tantamount to a requirement that the EPA may only bring enforcement actions for derogations from the SIP that have already occurred.

Given that the parties do not otherwise dispute the adequacy of Gordon-Darby's notice, Gordon-Darby will likely be able to demonstrate at trial that it complied with the notice requirements of § 7604(b) prior to commencing suit.

## II.    Irreparable Harm

Having concluded that Gordon-Darby is likely to succeed on the merits, the court turns to irreparable harm. Irreparable harm is a "necessary threshold showing for an award of preliminary injunctive relief." González-Droz, 573 F.3d at 79 (quoting Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)). Although harm is likely to be reparable when it is "almost purely economic," Longo En-Tech P.R., Inc. v. EPA, Civ. No. 16-3151 (DRD), 2017 WL

878442, at *8 (D.P.R. Mar. 6, 2017), economic harm may be deemed irreparable when it is not compensable by legal remedies, K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 914 (1st Cir. 1989). Indeed, "[i]rreparable harm most often exists where a party has no adequate remedy at law." Charlesbank, 370 F.3d at 162. "Where a plaintiff stands to suffer a substantial injury that cannot be adequately compensated by an end-of-case award of money damages, irreparable harm exists." Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 222 (1st Cir. 2003).

In this case, Gordon-Darby stands to suffer significant economic harm as a result of the I/M program's repeal. As noted, Gordon-Darby NHOST expects to lose approximately $4.1 million through the remainder of the term of its contract with New Hampshire based on historical motor vehicle inspection rates. As administering the I/M program is Gordon-Darby NHOST's sole source of revenue, the repeal of the I/M program will eliminate all of Gordon-Darby NHOST's business, requiring it to lay off its employees. Repeal of the I/M program will lead to additional costs to Gordon-Darby NHOST as it winds down its business, including the costs of retrieving and decommissioning inspection equipment from inspection stations and from vacating leased premises. Finally, Gordon-Darby will likely be unable to repurpose inspection supplies currently in Gordon-Darby NHOST's possession, requiring Gordon-Darby to absorb the cost of those supplies' obsolescence.

While much or all of these harms are economic in nature, "multiple federal courts have recognized [that] the Clean Air Act does not authorize a private cause of

action for compensatory damages." Barca v. CSX Freight R.R., Civ. No. 18-40192-TSH, 2019 WL 9045456, at *2 (D. Mass. Mar. 1, 2019); see also 42 U.S.C. § 7604(a) (providing that a district court may "enforce . . . an emission standard or limitation" violated by the defendant or "apply any appropriate civil penalties" while making no mention of damages); Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 14-15 (1981) ("'[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it' . . . [i]n the absence of strong indicia of a contrary congressional intent . . . ." (quoting Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 19 (1979))); Torres Maysonet v. Drillex, S.E., 229 F. Supp. 2d 105, 108-09 (D.P.R. 2002) (surveying legislative history showing congressional intent to exclude a damages remedy for Clean Air Act citizen suits). Thus, Gordon-Darby's injuries "cannot adequately be compensated by an end-of-case award of money damages." Rosario-Urdaz, 350 F.3d at 222.

The Commissioners assert that Gordon-Darby's economic harms are compensable by an award of damages for breach of contract.[10] See RSA 491:8

---

[10] The Commissioners also argue that Gordon-Darby fails to demonstrate irreparable harm because (1) Gordon-Darby NHOST had no enforceable contractual right to receive payments from inspection stations because its contract to act as New Hampshire's vendor was terminable for convenience by the state and (2) the state could simply elect to hire a new vendor even if enjoined from repealing the I/M program. The court rejects these arguments for the same reasons it rejected them with respect to redressability.

(waiving sovereign immunity for actions in New Hampshire superior court founded on a contract with the state). For several reasons, the court disagrees.

First, Gordon-Darby NHOST is the party to the contract with the state, not Gordon-Darby. While Gordon-Darby NHOST is Gordon-Darby's subsidiary, "[i]t is well settled law that parent corporations and their subsidiaries are legally distinct entities and that a contract under the corporate name of one cannot be treated as that of both."[11] Satellite Broad. Cable, Inc. v. Telefonica de España, S.A., 786 F. Supp. 1089, 1101 (D.P.R. 1992); accord, e.g., R.R. Donnelley & Sons Co. v. Marino, 505 F. Supp. 3d 194, 204 (W.D.N.Y. 2020) ("The law is clear that a parent corporation may not assert the legal rights belonging to its subsidiary."). "This conclusion follows from the principle that a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent." Marino, 505 F. Supp. 3d at 204 (quoting Feinberg v. Katz, No. 99 CIV. 45 (CSH), 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002)). Thus, to the extent Gordon-Darby NHOST has a viable breach-of-contract claim, Gordon-Darby, as the plaintiff in this case, would be unlikely to have the right to assert that claim on Gordon-Darby NHOST's behalf.

In addition, it is not clear on these facts that Gordon-Darby NHOST can state a breach-of-contract claim upon which relief could be granted. See Rosario-Urdaz,

---

[11] This principle of law does not alter the court's conclusion that monetary costs to Gordon-Darby NHOST cause an injury in fact to Gordon-Darby for Article III purposes. See Franchise Tax Bd., 493 U.S. at 336 ("[T]he Court of Appeals was quite right in holding that respondents have Article III standing to challenge the taxes that their wholly owned subsidiaries are required to pay.").

350 F.3d at 222 (reversing denial of preliminary injunction motion where, although it was "theoretically possible" the plaintiff could pursue a claim for damages against the defendants pursuant to 42 U.S.C. § 1983, "the district court made no findings concerning the many potential obstacles to such a damages award, including whether the individual defendants would be entitled to qualified immunity"). The contract between New Hampshire and Gordon-Darby NHOST expressly provided New Hampshire the right to terminate the contract for convenience on thirty days' written notice. Given that Gordon-Darby NHOST's damages flow from New Hampshire exercising its contractual rights, it is difficult to see how Gordon-Darby NHOST has a plausible claim to relief for breach of the express terms of the contract.

Nor can this court conclude, based on New Hampshire law as it currently exists, that Gordon-Darby NHOST has a substantial claim that New Hampshire's termination of the contract constitutes a breach of the implied covenant of good faith and fair dealing. In this context, that covenant requires parties to a contract to refrain from "behavior inconsistent with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 140 (1989) (Souter, J.). However, the New Hampshire Supreme Court recently declined to decide whether a contracting party's right to exercise a termination-for-convenience provision is limited by this implied obligation of good faith performance. Hate to

Paint, LLC v. Ambrose Dev., LLC No. 2023-0076, 2024 WL 4765322, at *2 (N.H. Nov. 13, 2024).

In Hate to Paint, the plaintiff argued that a termination-for-convenience provision was necessarily limited by the implied covenant of good faith and fair dealing. Id. Otherwise, the plaintiff claimed, the contract would be unenforceable; the defendant's obligations would be illusory because it could terminate whenever it desired. Id. The Court assumed without deciding that the termination-for-convenience provision was limited by the implied covenant,[12] but nevertheless held that exercising the provision in order to obtain a better price from another vendor, as the defendant did in Hate to Paint, did not violate the covenant. Id. The Court found that the plain meaning of "convenience" put the plaintiff on notice that the defendant could terminate the contract whenever "suitable or agreeable to [the

---

[12] Although Hate to Paint declined to decide whether the termination-for-convenience provision before the court was circumscribed by the obligation of good faith and fair dealing, the Supreme Court held in its "seminal case on the implied obligation of good faith performance" that a "contract to pay $200 a month for 'such personal services as the plaintiff, in his sole discretion, may render,' required the plaintiff to provide a level of services consistent with good faith." Centronics, 132 N.H. at 191 (alterations omitted) (quoting Griswold v. Heat Inc., 108 N.H. 119, 124 (1967)). Although the plaintiff was "expressly conferred discretion to do nothing at all," that discretion was limited by the implied obligation of good faith performance. Id. at 192. Otherwise, the contract would have been unenforceable insofar as "the plaintiff's undertaking [would be] illusory [because] the contract literally gave him the discretion to make it." Id. Other courts have recognized that circumscription of termination-for-convenience provisions by the covenant of good faith and fair dealing is necessary to avoid illusory contracts. See, e.g., Davidson Oil Co. v. City of Alguquerque, 108 F.4th 1226, 1231-32 (10th Cir. 2024) (applying New Mexico law). It is worth noting that Hate to Paint is unpublished. The New Hampshire Supreme Court's rules provide that it is not bound by its unpublished opinions. See State v. Beattie, 173 N.H. 716, 724 (2020) (citing N.H. Sup. Ct. R. 12-D(3)).

defendant's] needs or purpose," such that the defendant's "decision to exercise the termination for convenience provision to obtain the services for a better price [was not] contrary to the parties' 'justified expectations.'" Id. (first quoting Random House Webster's Unabridged Dictionary at 443 (2d ed. 2001), and then quoting Richard v. Good Luck Trailer Court, 157 N.H. 65, 70 (2008)).

Here, even assuming New Hampshire law would recognize a good-faith limitation on the exercise of the termination for convenience provision, it is difficult to see how Gordon-Darby NHOST has a plausible claim for violation of the implied covenant where NHDOS terminated the contract when suitable to its purposes: fulfilling its duty to implement duly-enacted state laws repealing the I/M program. Id.

What is more, while RSA 491:8 waives New Hampshire's sovereign immunity for contract actions in New Hampshire state court, it does not waive immunity for actions brought in federal court. RSA 491:8; see Metcalf & Eddy, Inc. v. Town of Gorham, 587 F. Supp. 32, 33-34 (D.N.H. 1984); see also Laro v. New Hampshire, No. 98-547-M, 2000 WL 700264, at *10 (D.N.H. Mar. 29, 2000) ("New Hampshire's Eleventh Amendment immunity relates not only to whether it may be sued, but also to where it may be sued."). But the Clean Air Act's citizen suit provision only authorizes federal courts to grant relief. See 42 U.S.C. 7604(a). Thus, even if Gordon-Darby could press Gordon-Darby NHOST's contract claim, it could not maintain a single action raising both its Clean Air Act and the contract claim. Gordon-Darby would have to either abandon its Clean Air Act claim in order to

pursue contract damages, or maintain lawsuits in two separate courts—and face the possibility of a claim-splitting defense.[13]

Moreover, even if Gordon-Darby or Gordon-Darby NHOST had a plausible breach-of-contract claim in this court or a New Hampshire court, any recovery against New Hampshire is barred by the terms of the contract. To the extent the state breached its contract with Gordon-Darby NHOST, Gordon-Darby's only damages—loss of revenue in the form of lost payments from inspection stations— would be consequential damages stemming from the state's breach. See Salem Eng'g & Constr. Corp. v. Londonderry Sch. Dist., 122 N.H. 379, 383-84 (1982) (contrasting direct damages, which are "the amount due [under the contract] plus interest," from consequential damages, which are those damages that "follow [from] the breach in the natural course of events," or that "the breaching party had reason to foresee"). The contract between Gordon-Darby NHOST and the state provides that neither party "shall . . . be liable for any consequential, special, indirect, incidental, punitive, or exemplary damages." Doc. no. 22-3 at 53. The New Hampshire Supreme Court generally enforces contractual limitations on consequential damages unless the limitation is unconscionable. E.g., Xerox Corp. v.

---

[13] Such a defense is unlikely to be successful, however, since sovereign immunity would bar the contract claim in this court. See Woonasquatucket River Watershed Council v. USDA, 778 F. Supp. 3d 440, 459 (D.R.I 2025) (claim splitting doctrine requires a litigant with multiple claims arising from the same common nucleus of operative facts to bring those claims in a single suit so long as all of those claims "fall within the Court's jurisdiction" (quoting Perry v. Alexander, No. 2:15-cv-00310-JCN, 2017 WL 3084387, at *3 (D. Me. July 19, 2017))), appeal filed, No. 15-1428 (1st Cir. May 1, 2025).

Hawkes, 124 N.H. 610, 617 (1984). In addition, the contract expressly limits the

state's liability to Gordon-Darby NHOST to "the total [c]ontract price"—which,

because the state makes no payments to Gordon-Darby NHOST under the contract,

is $0. Doc. no. 22-3 at 53, 23. In other contexts, the New Hampshire Supreme Court

has recognized that parties to a contract are generally "free to contractually limit

the extent of their liability," provided they do so unambiguously and without

violating any applicable laws. Santos v. Metro. Prop. & Cas. Ins. Co., 171 N.H. 682,

686 (2019) (insurance company).

Finally, the Commissioners assert that the Clean Air Act permits numerous

other remedies, such that a preliminary injunction is not necessary to remedy

economic injury to Gordon-Darby. See, e.g., 42 U.S.C. § 7413 (authorizing EPA

enforcement action). However, the enforcement mechanisms the Commissioners

point to involve EPA-led actions; Gordon-Darby cannot direct the EPA to avail itself

of such enforcement measures. Moreover, and as the Commissioners acknowledge,

the EPA enforcement mechanisms the Commissioners rely upon would involve

timelines for coming into compliance with the applicable SIP, which could be up to

18 months. See, e.g., id. § 7509(a). Gordon-Darby NHOST has already suffered a

decrease in revenue, and it will stop receiving revenue altogether when the I/M

program's repeal takes effect on January 31, 2026. Thus, the alternative

enforcement mechanisms the Commissioners point to fail to demonstrate that a

preliminary injunction is unnecessary to remedy imminent and otherwise

irreparable harm.

For all of these reasons, the court concludes that, absent a preliminary injunction, Gordon-Darby will likely suffer substantial injuries which cannot be remedied by an end-of-case money damages award. Therefore, irreparable harm exists.

III.    Balance of Equities and the Public Interest

As noted, when the defendants are government entities or officials sued in their official capacities, the balance of equities and public interest factors merge. Does 1-6, 16 F.4th at 37. As just discussed, Gordon-Darby would suffer substantial and irreparable harm in the absence of preliminary relief. By contrast, the Commissioners stand to suffer little harm if a preliminary injunction is granted; a preliminary injunction would simply maintain the status quo prior to HB2's enactment.

In addition, "[g]ranting a preliminary injunction to ensure compliance with the [Clean Air Act] is in the public interest." Envt'l Democracy Project v. Green Sage Mgmt., LLC, No. 22-cv-3970-JST, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022). "Courts have consistently held that there is a strong public interest in health and safety." Massachusetts v. Nat'l Insts. of Health, 770 F. Supp. 3d 277, 326 (D. Mass. 2025). The public has an interest in the continuation of an I/M program that the EPA deemed sufficient to assist New Hampshire in achieving applicable air-quality standards. The public also has an interest in the continuation of an annual safety inspection requirement that keeps unsafe vehicles off the roads. Finally, a preliminary injunction furthers the public interest by maintaining the status quo

until such time as the repeal of the I/M program can go into effect (if at all) without violating the Clean Air Act. In this way, the injunction reduces the regulatory uncertainty that results from stopping and then restarting the I/M program. Such public uncertainty as to inspection requirements could undermine confidence in the I/M program and lead to greater noncompliance among motorists.

IV.    Injunction Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." "A district court has 'substantial discretion to dictate the terms of an injunction bond.'" HCC Specialty Underwriters, Inc. v. Woodbury, 289 F. Supp. 3d 303, 330 (D.N.H. 2018) (quoting Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991)). A court may dispense with a bond when one is not requested by the non-movant. Nat'l Educ. Ass'n-N.H. v. NH Atty. Gen., --- F. Supp. 3d ----, 2025 WL 2807652, at *27 (D.N.H. 2025). In their surreply, the Commissioners state they do not request a bond. Doc. no. 29 at 6. The court therefore concludes a bond is unnecessary.

V.    Scope of Relief

As a general matter, "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiffs." Califano v. Yamasaki, 442 U.S. 682, 702 (1979). The Supreme Court recently held that so-called "universal" injunctions, which extend injunctive relief to nonparties, are in most

42

instances broader than necessary to provide a plaintiff with complete relief. See

Trump v. CASA, Inc., 606 U.S. 831, 837 & n.1 (2025). But a universal injunction

may be appropriate when it is "impossible . . . to craft relief that is complete and

benefits only the named plaintiffs." Id. at 852 n.12. In this case, the only way to

provide Gordon-Darby with complete relief is an indivisible injunction requiring the

Commissioners to continue to implement the I/M program contained in New

Hampshire's SIP. And the Commissioners raised no objection to the scope of the

preliminary injunction Gordon-Darby has requested.

## CONCLUSION

Gordon-Darby's motion for a preliminary injunction is granted as follows:

1.  Defendants Robert L. Quinn, in his official capacity as Commissioner of the

    New Hampshire Department of Safety, and Robert R. Scott, in his official

    capacity as Commissioner of the New Hampshire Department of

    Environmental Services, and their agents, employees, representatives,

    successors, and any other person acting directly or in concert with them, are

    hereby:

    a.  Enjoined from taking or directing any action to terminate,

        suspend, or otherwise cease implementation or enforcement of

        the State of New Hampshire's vehicle inspection and

        maintenance program, as codified in New Hampshire's federally

        approved state implementation plan, unless and until the

        United States Environmental Protection Agency grants final

approval of a revised state implementation plan removing or

otherwise amending that vehicle inspection program; and

    b.  Ordered to take all steps necessary to resume and ensure the

continued implementation and enforcement of the State of New

Hampshire's vehicle inspection and maintenance program, as

codified in New Hampshire's federally approved state

implementation plan.

2.    This injunction shall take effect immediately and shall remain in effect until

further order of this court.

    SO ORDERED.

_____

Landya McCafferty
United States District Judge

January 27, 2026

cc:    Counsel of Record